UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAYNE K TATE,

                Plaintiff,                    Civil Action No. 10-cv-14107

      v.                        District Judge Bernard A. Friedman
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 13]**

      Plaintiff Wayne Tate brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act.  Both parties filed summary judgment motions (Dkts. 9, 13), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkts. 3, 11).

## I.  RECOMMENDATION

      For the reasons set forth below, substantial evidence does not support the ALJ's finding that an examining physician described Plaintiff as capable of sedentary work.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On June 11, 2008, Plaintiff filed an application for SSI with an alleged disability onset date of June 11, 2008. (Tr. 10, 22-23.)[1] The Commissioner initially denied Plaintiff's disability application on September 10, 2008. (Tr. 10, 46-49.) Plaintiff then filed a request for a hearing, and on February 17, 2010, he appeared with counsel before Administrative Law Judge ("ALJ") Oksana Xenos, who considered the case *de novo*. (Tr. 20-42.) In a March 11, 2010 decision, the ALJ found that Plaintiff was not disabled. (Tr. 10-16.) The ALJ's decision became the final decision of the Commissioner on September 7, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on October 13, 2010. (Dkt. 1.)

### B. Background

Plaintiff was 42 years old as of the alleged disability onset date and 44 years old at the time of the ALJ's decision. (*See* Tr. 16, 20, 108.) Plaintiff's physical limitations stem from heart conditions, including congestive heart failure, which have been treated in part with a defibrillator. (*See* Tr. 188-89.) Prior to his heart problems, Plaintiff completed two years of college studying building maintenance, and worked as a maintenance mechanic, press operator, and delivery man. (Tr. 26, 117, 135, 138.)

#### 1. The Hearing Before the ALJ

At the February 17, 2010 hearing before ALJ Xenos, Plaintiff, Plaintiff's mother, and a vocational expert testified.

---

[1]The original alleged onset date of June 9, 2008 was amended to June 11, 2008 on advice of counsel. (Tr. 10, 22-23, 108.)

2

### (a) Plaintiff's Testimony

Plaintiff testified that sometime around June 2008 he began to feel sick and his "chest just went to hurting." (Tr. 26.) After the third such incident he sought medical attention. (Tr. 26-27.) Plaintiff was diagnosed with congestive heart failure secondary to dilated cardiomyopathy with significant left ventricular systolic dysfunction, and had a defibrillator implanted. (Tr. 188-89.)

Plaintiff explained that he has not worked since receiving defibrillator. (Tr. 27.) He testified that he lacks the strength to lift drywall (Tr. 27), and that his medications cause frequent and/or urgent urination. (Tr. 28.) Plaintiff also explained that he sleeps only two or three hours per night because his defibrillator makes him "scared to go to sleep." (Tr. 32-33.) When asked about depression, Plaintiff appeared to reference a girlfriend who had left him but indicated that he was not otherwise depressed. (*See* Tr. 35.)

Plaintiff also testified about his activities of daily living. He said he lives with his mother and primarily "sit[s] at home and . . . sleep[s]." (Tr. 25, 28.) When he visits with friends, Plaintiff simply "sit[s] there" and watches a "basketball game or something like that." (Tr. 29.) Plaintiff said he could not go grocery shopping, does not drive, and, although he "tr[ies] to push [the lawnmower]," he does not cut the grass. (Tr. 30-31.) He stated that he did not need help with personal care like dressing or bathing, however. (Tr. 30.) Plaintiff attends church about three times a month. (Tr. 31.)

### (b) Plaintiff's Mother's Testimony

Plaintiff's mother, Velma Tate, offered limited testimony. (Tr. 36-38.) She testified that Plaintiff "doesn't have much strength," needed her help to pick things up, and that he could only do something for "about 15 minutes" before needing a break. (*Id.*) In accord with Plaintiff's testimony,

she provided that Plaintiff slept during the day, and went next door to watch games with a friend. (*Id.*)  Ms. Tate also stated that Plaintiff had been depressed about his illness, had crying spells, and had mentioned that he did not "have long" to live.  (Tr. 37-38.)

*(c) The Vocational Expert's Testimony*

Vocational Expert Jennifer Turecki also testified at the hearing.  The ALJ asked her to consider the following hypothetical:

> please assume an individual of the claimant's age at the alleged onset date, . . . and that age was 42, with two years of college and past work experience, who can perform work at the sedentary level, but does require a sit/stand option; cannot reach overhead with his left, non-dominant hand . . . and is limited to unskilled, routine work.

(Tr. 40.)[2]  The VE testified that such an individual could not perform Plaintiff's past-relevant work – a maintenance mechanic at the "heavy" exertional level and a press operator at the "medium" level – but could work as an information clerk (1,000 jobs in the region); a bench assembler (3,000 jobs); a surveillance system monitor (1,500 jobs); or a plastic sorter (1,500 jobs).  (Tr. 40.)

The ALJ next asked the VE to "assume that due to frequent episodes of pain, fatigue and a combination of other impairments, the individual [could not] sit, stand and/or walk a total of eight hours, five days a week on a regular and continuing basis."  (Tr. 41.)  The VE stated that full-time, competitive employment would be precluded.  (Tr. 41.)

---

[2]Plaintiff argues that the ALJ's inclusion of a left-arm limitation in the hypothetical indicates that the ALJ constructed the hypothetical arbitrarily, or, at least, inaccurately.  (Pl.'s Mot. Summ. J. at 13.)  But Plaintiff's self-completed function report provides, "[I] can't lift hand (left) over head."  (Tr. 124.)  Thus, the inclusion of a left-arm limitation actually cuts the other way: it indicates that the ALJ reviewed and considered the entire record.

2. *Medical Evidence*

The medical record in this case is limited. Essentially, the record consist of test results and medical reports from Plaintiff's hospitalizations around June 2008 and three subsequent medical opinions.

*(a) Medical Records From Plaintiff's Hospitalizations and Follow-Up Exam*

On May 31, 2008, Plaintiff went to the emergency room with complaints of chest pain at the ten-out-of-ten level. (Tr. 180.) The emergency-room physicians ordered a chest x-ray which was "negative for any acute cardiopulmonary process." (Tr. 181.) The x-ray did reveal, however, an enlarged heart and pulmonary-vascular congestion. (Tr. 198.) An electrocardiogram ("EKG") was also performed which showed biatrial enlargement, left ventricular hypertrophy,[3] and possible "lateral ischemic changes." (Tr. 181.) The emergency-room physicians diagnosed Plaintiff with acute chest pain, suspected acute coronary syndrome, and acute alcohol abuse. (Tr. 180.) He was admitted for consultation in "serious[] but stable condition." (Tr. 182.)

On June 1, 2008, Dr. Syed Mahmood, the consulting physician, found that Plaintiff had a "significantly" abnormal EKG and that Plaintiff's ejection fraction was "severely depressed." (Tr. 169.)[4] He also believed that Plaintiff had "accelerated hypertension" and "multiple symptoms of

---

[3]"Left ventricular hypertrophy is enlargement (hypertrophy) of the muscle tissue that makes up the wall of your heart's main pumping chamber (left ventricle). Left ventricular hypertrophy develops in response to some factor, such as high blood pressure, that requires the left ventricle to work harder." Mayo Clinic Staff, *Left Ventricular Hypertrophy* (May 1, 2010) *available at* http://www.mayoclinic.com/health/left-ventricular-hypertrophy/DS00680.

[4]"The term 'ejection fraction' refers to the percentage of blood that's pumped out of a filled ventricle with each heartbeat." Martha Gorgan, M.D., Mayo Clinic Cardiologist, *Answer to* "*What does the term 'ejection fraction' mean? What does it measure?*" (Sept. 17, 2010) *available at* http://www.mayoclinic.com/health/ejection-fraction/AN00360.

congestive heart failure." (Tr. 169.)[5] He "strongly encouraged" Plaintiff to quit smoking, which had been a 25-year, pack-a-day habit. (Tr. 169.) He also recommended further testing: an echocardiogram and an angiogram. (Tr. 169.)

Between June 2 and June 10, 2008 Plaintiff was hospitalized. (*See e.g.*, Tr. 206 (noting inpatient and discharge dates of June 2 and June 10, 2008, respectively); *see also* Tr. 164.) A June 2, 2008 echocardiogram revealed "cardiomegaly [enlarged heart] with marked impairment of overall left ventricular systolic function." (Tr. 196.) Plaintiff's "[c]alculated ejection fraction was at 15% and maybe even lower."[6] (Tr. 196.) Another test performed that day revealed dilated cardiomyopathy[7] but "no evidence for reversible ischemia." (Tr. 204.) On June 4, 2008, Dr. Mahmood performed the angiogram he had previously recommended and found that Plaintiff's epicardial coronary arteries were normal. (Tr. 192.) On June 9, 2008, Plaintiff had a single-chamber defibrillator implanted. (Tr. 188-89; *see also* Tr. 194-95; 200-01.) Plaintiff was discharged from

---

[5]Congestive heart failure "means your heart can't pump enough blood to meet your body's needs." Mayo Clinic Staff, *Heart Failure* (March 22, 2011) *available at* http://www.mayoclinic.com/health/heart-failure/DS00061. Symptoms of congestive heart failure include, shortness of breath (dyspnea) during exertion or when lying down, fatigue and weakness, swelling (edema) in the legs, ankles and feet, rapid or irregular heartbeat, persistent cough or wheezing with "white or pink blood-tinged phlegm," sudden weight gain from fluid retention, and difficulty concentrating. *Id.*

[6]"An [ejection fraction] of less than 35% increases the risk of life-threatening irregular heartbeats that can cause sudden cardiac arrest (loss of heart function) and sudden cardiac death. An implantable cardioverter defibrillator (ICD) may be recommended for these patients." Cleveland Clinic, *Understanding Your Ejection Fraction* (August 2010) *available at* http://my.clevelandclinic.org/ heart/disorders/heartfailure/ejectionfraction.aspx.

[7]"Dilated cardiomyopathy is a disease of the heart muscle, primarily affecting your heart's main pumping chamber (left ventricle). The left ventricle becomes enlarged (dilated) and can't pump blood to your body with as much force as a healthy heart can." Mayo Clinic Staff, *Dilated Cardiomyopathy* (Sept. 16, 2011) *available at* http://www.mayoclinic.com/health/ dilated-cardiomyopathy/DS01029.

the hospital the following day with instructions to stop activity at the first sign of chest pain or shortness of breath, to alternate activity periods with rest periods, and to eat a low-sodium, low-cholesterol diet. (Tr. 174.) Plaintiff was prescribed Coreg and Asprin for his heart disease and Lisinopril for his hypertension. (Tr. 176.)

About a week later, on June 17, 2008, Plaintiff returned to the emergency room. (Tr. 177-79; *see also* Tr. 185-87.) Plaintiff reported difficulty breathing over the prior few days. (Tr. 177.) An EKG revealed left atrial enlargement, and possible inferolateral ischemia. (Tr. 178.) A CT scan revealed "a patchy, ground-glass appearance" in Plaintiff's lungs suggestive of alveolitis (inflamation of the lung alveoli). (Tr. 178; *see also* Tr. 202-03.) Accordingly, the emergency room physician admitted Plaintiff to the hospital. (Tr. 179.)

The next day, Dr. Oronde White examined Plaintiff. (Tr. 164-67.) Plaintiff complained of fatigue, weakness, periodic diaphoresis, periodic lightheadedness and dizziness, and palpitations. (Tr. 165.) Dr. White assessed Plaintiff with, among other things, progressive dyspnea (shortness of breath) on exertion, congestive heart failure secondary to dilated cardiomyopathy with significant left ventricular systolic dysfunction, and hypertension. (Tr. 166.)

On June 20, 2008, Plaintiff was discharged from the hospital. Plaintiff's discharge instructions were similar to those given on June 10, 2008, but, additionally, his fluid intake was capped at 1.5 liters. (Tr. 171.)

In December 2008, Plaintiff had a physical exam where he reported shortness of breath in daily activity but not at rest. (Tr. 245.) The examining physician indicated that Plaintiff had palpitations, shortness of breath, and orthopnea (shortness of breath while lying flat). (Tr. 245.)

*(b) Primary Care Physician's Opinion*

On June 25, 2008, Dr. Rose Andriacki, Plaintiff's primary-care physician, completed a Michigan Department of Human Services Medical Examination Report.  (Tr. 242-43; *see also* Tr. 244 (Medical Needs Form).)  It appears that Dr. Andriacki had only reviewed Plaintiff's hospital records and examined him once prior to completing the Medical Examination Report.  (*See* Tr. 242 (providing date of first exam as June 25, 2008 but noting 15% ejection fraction and providing "see attached" in section requesting laboratory and x-ray findings).)  Dr. Andriacki provided that Plaintiff was diagnosed with dilated cardiomyopathy with congestive heart failure and hypertension.  (Tr. 242.)  On exam, she found that Plaintiff had shortness of breath, tachypnea (increased breathing rate), and "rales" (crackling noises in his lungs).  (Tr. 242.)  She provided that Plaintiff's condition was stable.  (Tr. 243.)  In terms of functional limitations, Dr. Andriacki opined that Plaintiff could "[s]tand and/or walk less than 2 hours in an 8-hour work day" and "[s]it less than 6 hours in an 8-hour workday."  (Tr. 243.)  She also opined that Plaintiff could not "perform repetitive actions because of lack of endurance."  (Tr. 243.)

*(c) State Disability Determination Services Opinions*

On August 20, 2008, Dr. V. Dang-Vu evaluated Plaintiff for State Disability Determination Services ("DDS").  He noted that since Plaintiff's June 17, 2008 hospitalization (which was only two months earlier) "the patient did not have any more episodes of congestive heart failure."  (Tr. 210.)  Plaintiff reported shortness of breath upon exertion such as walking one block or climbing up one flight of stairs.  (Tr. 210.)  Plaintiff provided that he was "still able to do housework but . . . gets tired when he mows the lawn."  (Tr. 210.)  Upon examination, Dr. Dang-Vu concluded,

> There is no evidence of cardiac decompensation at this time. There
> is no ankle edema. The lungs are clear on auscultation. There is

8

presence of S3 gallop on auscultation of the heart. . . . The patient is
hypertensive but his blood pressure is well controlled on current
treatment.

In summary this patient has a history of congestive heart failure.
Currently the patient is stable. He has an [implantable cardioverter-
defibrillator] in place. His only complaint is irritation of the chest
wall around the ICD. The patient had no evidence of congestive
heart failure. The lungs are clear and there is no ankle edema. No
evidence of functional impairment seen on examination at this time.

(Tr. 212.)

The next month, on September 8, 2008, Dr. Claire Issa reviewed Plaintiff's medical file and

completed a Physical Residual Functional Capacity Assessment form for the State DDS. (Tr. 214-

21.) Dr. Issa opined that Plaintiff could occasionally lift or carry 10 pounds, stand or walk for "at

least" two hours in an eight-hour workday, and sit "about" six hours in an eight-hour workday. (Tr.

215.) In a section asking for an explanation for these conclusions, Dr. Issa provided "[w]alking 2-4

hours. Lifting 2-8 [pounds]." (Tr. 215.) She also relied on Dr. Dang-Vu's findings:

[Consultative Examiner] exam: NO SIGNS OF CARDIAC
DECOMPENSATION. He is stable. Lungs clear. [Blood pressure]
132/86. Can't lift > 20 [pounds]. No pedal edema. So he is not
decompensated now, but the history of his disease is severe. His
ADLs show significant limitations . . . [r]ight after the discharge.
Sedentary RFCA done.

(Tr. 216.) On a "Case Analysis" form, Dr. Issa provided, "[t]his case was close to allowance, but

after [Plaintiff's] discharge on 6/17/08, he improved and the [Consultative Examiner] found no

evidence of cardiac decompensation. Sedentary RFCA done." (Tr. 236.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Supplemental Security Income is available only

for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The

Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the
application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are
> denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments
> that "significantly limits . . . physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe
> impairment that is expected to last for at least twelve months, and the severe impairment
> meets or equals one of the impairments listed in the regulations, the claimant is conclusively
> presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied
> without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other
> work exists in the national economy that plaintiff can perform, in view of his or her age,
> education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

### D.  The Administrative Law Judge's Findings

10

At step one, ALJ Xenos found that Plaintiff has not engaged in substantial gainful activity since June 11, 2008—Plaintiff's amended alleged onset date and SSI application date. (Tr. 12.) At step two, she found that Plaintiff had the following severe impairments: "dilated cardiomyopathy with congestive heart failure; hypertension; and history of substance abuse." (Tr. 12.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 12.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "sedentary work as defined in 20 CFR 416.967(a) except the claimant is limited to unskilled routine work; requires a sit/stand option; and cannot reach overhead with his left (non-dominant) hand." (Tr. 13.) At step four, she found that Plaintiff could not perform any past relevant work. (Tr. 15.) At step five, the ALJ relied on VE testimony in response to her hypothetical, and found that work existed in significant numbers that Plaintiff could perform: information clerk, bench assembler, surveillance system monitor, and plastics sorter. (Tr. 16.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

11

because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the

12

credibility of witnesses, including that of the claimant.").

**F. Analysis**

On appeal to this Court, Plaintiff makes several arguments. First, he asserts that Dr. Andriacki is a treating physician and the ALJ interpreted her opinion incorrectly. (Pl.'s Mot. Summ. J. at 11; *see also* Dkt. 14, Pl.'s Reply at ECF Pg ID 317-18.) Next, Plaintiff asserts that the ALJ did not provide an adequate explanation in her narrative, as required by S.S.R. 96-8p, for her RFC assessment. (Pl.'s Mot. Summ. J. at 12-13.) Third, Plaintiff argues that the ALJ erred by conclusorily evaluating Plaintiff's credibility. (*Id.* at 14-17.) Finally, Plaintiff claims that the ALJ failed to give due deference to the fact that Plaintiff has been awarded State Disability Assistance under similar disability criteria. (*Id.* at 17-18.)

> *1. The ALJ Erred in Finding that Dr. Andriacki's Opinion Described Plaintiff as Capable of Sedentary Work*

Although this Court finds, for reasons detailed below, that the ALJ erred in interpreting Dr. Andriacki's opinion, a threshold issue must be resolved. Plaintiff asserts that Dr. Andriacki is a treating source and, therefore, the heightened explanatory and deference requirements of the treating-source rule apply to her opinion. (*See* Pl.'s Reply at ECF Pg ID 317-18.) This Court disagrees. First, there is only a single medical record from Dr. Andriacki in the administrative record. The Sixth Circuit has held that single visit to a physician does not make the physician a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship . . . . Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."). And even if Dr. Andriacki and Plaintiff developed the requisite treating-source relationship after the single visit

13

evidenced in the record, Dr. Andriacki's June 25, 2008 opinion was not entitled to treating-source deference: at the time she authored that opinion she had examined Plaintiff only once. *See Kornecky*, 167 F. App'x at 506 ("[T]he relevant inquiry is not whether [the examining doctor] might have become a treating physician in the future if [Plaintiff] had visited him again. The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion*."); *see also* 20 C.F.R. § 404.1527(d)(2) ("[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence *that cannot be obtained from . . . reports of individual examinations*, such as consultative examinations or brief hospitalizations." (emphasis added)).

But this does not fully address Plaintiff's assignment of error. Plaintiff's more fundamental point is that the ALJ made an erroneous factual finding regarding Dr. Andriacki's opinion. (Pl.'s Mot. Summ. J. at 11.) More specifically, Plaintiff says the ALJ erred in concluding that "Dr. Andriacki prepared a medical report describing the claimant as capable of sedentary work." (Tr. 14.) According to Plaintiff, Dr. Andriacki in fact found that Plaintiff could sit for less than six hours and stand or walk for less than two hours – findings which are inconsistent with the demands of sedentary work. (Pl.'s Mot. Summ. J. at 11.) The Court agrees that the ALJ's interpretation of Dr. Andriacki's opinion is not supported by substantial evidence.

The applicable regulations provide that

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria

14

are met.

20 C.F.R. § 416.967(a).  Additionally, Social Security Ruling ("S.S.R.") 96-9p provides,

> In order to perform a full range of sedentary work, *an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday*, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.  *If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded.*  The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work.

1996 WL 374185 at *6 (emphases added).[8]

Here Dr. Andriacki found that Plaintiff could "[s]tand and/or walk *less* than 2 hours in an 8-hour [workday]" and could "[s]it *less* than 6 hours in an 8-hour workday."  (Tr. 243 (emphases added).)  This does not, as the ALJ concluded, "describe[e] the claimant as capable of sedentary work."  *See Maffia v. Comm'r of Soc. Sec.*, 291 F. App'x 261, 264 (11th Cir. 2008) (noting that, among other errors, "the ALJ ignored the real possibility that Dr. Mishra indicated that [Plaintiff] could sit for less than six hours in an eight-hour day, where a sedentary job involves sitting for six hours a day."); *Cannon v. Astrue*, No. 1:09-cv-00080, 2011 WL 465978, at *5 (M.D. Tenn. Feb. 3, 2011) ("[T]he ALJ stated that [plaintiff's treating physician] 'determined the claimant could perform sedentary work during two different assessments.'  As previously noted, [the treating physician] opined . . . that Plaintiff could sit for less than about six hours in an eight-hour workday, and on [the

---

[8]S.S.R.s "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency.  20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990))).

other occasion] that Plaintiff could sit for four hours in an eight-hour workday. [These] opinions of Plaintiff's sitting limitations do not meet the requirements of sedentary work as defined by SSR 83-10, and contrary to the ALJ's assertion, Dr. Adams did not 'determine[] the claimant could perform sedentary work during two different assessments.'" (internal citations omitted)); *Raufova v. Chater*, No. CV-94-5007, 1995 WL 561340, at *3 (E.D.N.Y. Sept. 20, 1995) ("Dr. Carlen . . . determined that [Plaintiff] could sit for less than six hours a day, stand and walk for only two hours, and that her ability to lift and carry was limited. Viewed in isolation, the fact that [Plaintiff] can sit for less than six hours per day alone indicates that she cannot perform her prior relevant work as a bookkeeper, which is sedentary in nature, or any other form of sedentary work." (internal citations omitted)).

The Commissioner cites S.S.R. 83-10p to argue that sedentary work may involve less than six hours of sitting in a workday. (Def.'s Mot. Summ. J. at 9.) In particular, the Commissioner quotes the following language from that Ruling:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and *sitting should generally total approximately 6 hours of an 8-hour workday*.

S.S.R. 83-10, 1983 WL 31251 at *5 (emphasis added).

But this language, read in context, lends limited support to the Commissioner's position. Just before the quoted language, the Ruling provides:

> Sedentary work. The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. *Jobs are sedentary if walking*

16

> *and standing are required occasionally and other sedentary criteria are met. . . .*

S.S.R. 83-10, 1983 WL 31251 at *5 (emphasis added).  Thus, the Commissioner's quoted passage from S.S.R. 83-10 merely clarifies what precedes it.  That is, the Ruling provides that jobs are sedentary if walking and standing are required only "occasionally" (and other sedentary criteria are met), and then clarifies that "occasionally" is "generally total[ing] no more than about 2 hours of an 8-hour workday."  *See* S.S.R. 83-10.  A necessary corollary, and as stated in the Ruling itself, is that "sitting should generally total approximately 6 hours of an 8-hour workday."  *See* S.S.R. 83-10.  Read as such, the Ruling provides that because walking and/or standing should be at most "about 2 hours," sitting should be the remaining "approximately 6 hours" of an eight-hour workday.  *See* S.S.R. 83-10; *see also* S.S.R. 96-9p ("In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday.").[9]  And, as discussed, Dr. Andriacki opined that Plaintiff could not sit for "about" six hours in an eight-hour day.  (Tr. 243.)

What remains is whether the ALJ's erroneous interpretation of Dr. Andriacki's opinion was harmless.  The ALJ could have rejected Dr. Andriacki's examining (but not treating) opinion by explaining why Drs. Dang-Vu and Issa's opinions should be credited over that of Dr. Andriacki. *See Kornecky*, 167 F. App'x at 507-08 ("Here, [as compared to the ALJ's treatment of the treating source opinion in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004)], the ALJ neither misstated nor ignored a treating physician's opinion; he merely failed to explain why he favored

---

[9]Moreover, similar distinctions between "less" and "about" appear on the standard State DDS RFC Assessment form, which was presumably designed with the applicable regulations and rulings in mind.  (*See e.g.*, Tr. 215 (providing sitting limitations of "less than about 6 hours" and "about 6 hours").)

several *examining* physicians' opinions over another's." (emphasis added)).

But that is not what the ALJ did. Rather, she viewed the three opinions as consistent with each other. In particular, the ALJ never explicitly rejected Dr. Andriacki's opinion in favor of another doctor's opinion. (*See* Tr. 14.) And, as noted, she interpreted Dr. Andriacki's opinion as describing sedentary work – which places Dr. Andriacki's opinion in accord with the two other opinions of record. (*See* Tr. 14 (noting that Dr. Issa's opinion was "consistent" with the record "as a whole").)

A different case would have presented itself, however, if the ALJ had (correctly) treated Dr. Andriacki's opinion as inconsistent with those of the State DDS physicians. This is especially so given that Dr. Issa found that "[t]his case was close to allowance" (Tr. 236), and the VE testified that if "the individual [could not] sit, stand and/or walk a total of eight hours, five days a week on a regular and continuing basis" competitive employment would be precluded (Tr. 41). The Court would be engaging in pure speculation to assume the ALJ would have found Plaintiff not disabled had she correctly interpreted Dr. Andriacki's opinion as contrary to – rather than consistent with – the State DDS physicians' opinions. The Court declines to engage in such speculation and instead finds that the better recourse is for the ALJ to first explain how the now-inconsistent opinions of record should be reconciled. *See Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision post hoc even when substantial evidence exists to support the ALJ's decision."). Remand is therefore warranted.

### 2. *Plaintiff's Arguments Regarding the ALJ's RFC and Credibility Assessments Are Moot*

Plaintiff also asserts that the ALJ did not provide an adequate explanation in her narrative

for her RFC assessment.  (Pl.'s Mot. Summ. J. at 12-14.)  In particular, Plaintiff argues that the ALJ did not explain, as required by S.S.R. 96-8p, how Plaintiff's chronic fatigue, pain symptoms, and medication side effects were accounted for in determining Plaintiff's RFC.  (*Id.* at 13-14.)

This argument is moot given the Court's analysis above.  Because the ALJ did not correctly account for Dr. Andriacki's opinion, the ALJ will need to rewrite her narrative – a least insofar as it applies to Plaintiff's RFC.  The Court notes, however, that S.S.R. 96-8p does provide:

> NARRATIVE DISCUSSION REQUIREMENTS
>
> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.*

S.S.R. 96-8p, 1996 WL 374184, at *6-7 (emphasis added, internal footnote omitted).

Plaintiff also argues that the ALJ erred in evaluating Plaintiff's credibility or otherwise failed to adequately explain how she evaluated Plaintiff's credibility.  (*See* Pl.'s Mot. Summ. J. at 14-17.)

Again, this argument is moot because Plaintiff's credibility will have to be evaluated against Dr. Andriacki's now-supporting opinion on remand.  However, the Court takes this opportunity to note that conclusory statements masquerading as reasons do not satisfy the procedural requirements for evaluating credibility.  This Court has summarized those requirements in *Flood v. Comm'r of Soc. Sec.*, 2:10-cv-14819, 2011 U.S. Dist. LEXIS 115893, at *22-31 (E.D. Mich. Aug. 30, 2011) (Michelson, M.J.) *report adopted over objections by* 2011 U.S. Dist. LEXIS 113506 (E.D. Mich.

Oct. 3, 2011) (Zatkoff, J.).  Here, it sufficient to note that S.S.R. 96-7p provides:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *2.

### 3.   The ALJ Was Not Required to Give Deference to Plaintiff's State Disability Assistance Award

Lastly, Plaintiff asserts that the ALJ failed to give due deference to the fact that he has been awarded State Disability Assistance, an award which required him to satisfy disability criteria similar to that applied by the ALJ.  (Pl.'s Mot. Summ. J. at 17-18.)

This argument is undeveloped, and more importantly, this Court disagrees on the merits.  As aptly explained by a Court in this District:

> Plaintiff objects to the Magistrate Judge's failure to consider the disability finding by the State of Michigan ALJ.  Plaintiff was found to be disabled by the State of Michigan . . . and entitled to State Disability Assistance ("SDA").  Plaintiff argues that it was error to not consider this finding because the "SDA applies the same operative definition for 'disabled' as used for SSI under Title XVI of the Social Security Act."
>
> Plaintiff's objection is without merit. The Regulations clearly state that "[a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind."  20 C.F.R. § 416.904; *see also Noble v. Sec'y of Health and Human Servs.*, No. 88-1433, 1989 WL 25784, at *1 (6th Cir. 1989) ("Plaintiff Noble is in error in concluding that the findings of the state agency were in any way binding upon the Secretary.").

> Accordingly, the ALJ and Magistrate Judge were not required to consider the conclusion by the state agency that Plaintiff was disabled, and the court will overrule this objection.

*Elias v. Comm'r of Soc. Sec.*, No. 08-14583, 2009 WL 5166200, at *7 (E.D. Mich. Dec. 18, 2009) (internal citations omitted).  Accordingly, the ALJ was not required to give deference to the State's award of disability assistance.

### G. Conclusion

For the foregoing reasons, substantial evidence does not support the ALJ's finding that examining physician Andriacki described Plaintiff as capable of sedentary work.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.  On remand, the ALJ should treat Dr. Andriacki's sitting and standing limitations as inconsistent with the requirements of sedentary work, and evaluate all the functional limitations Dr. Andriacki provided against the other evidence of record (including the other opinion evidence and Plaintiff's testimony).

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


                                      s/Laurie J. Michelson
                                      LAURIE J. MICHELSON
                                      UNITED STATES MAGISTRATE JUDGE

Dated:  November 18, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by
electronic means or U.S. Mail on November 18, 2011.

                                      s/Jane Johnson
                                      Deputy Clerk